May it please the Court. My name is Howard Shalowitz and I represent the appellant Hope White in both her individual capacity and her capacity as personal representative for the estate of her son Myron Pollard. Ms. White is in the courtroom with us today. Your Honor, before we begin with the actual arguments that we set forth in our briefs, I would like to just give some brief factual background about this case if I may. This happened in August of 2012. It was a reverse sting operation that was put forth by the Bureau of Alcohol, Tobacco, and Firearms to round up some young African American men who were teenagers in their early 20s around the St. Louis area. Myron Pollard, who actually was killed by Agent Hansen, was not part of this investigation at all. What happened was they had a pre-operational meeting with dozens of ATF agents with City of St. Louis Police Force and they knew that there was going to be a bucket truck that they knew where everyone was going to be stationed, people were secreted, and the ATF agents were in a U-Haul. They were given orders when to come out, etc. What happened that morning was there was a setup of four cameras by special agent or technical assistant French that were set up. Two of them were underneath a tractor trailer. One of them was on a pole that was set up a few days in advance, and the other one was in the surveillance vehicle. The one on the pole was just video. The two underneath the tractor trailer were video and audio, and the one in the surveillance was also video and audio. That morning, a man by the name of Demetrius Creighton went and picked up Myron Pollard, who was a friend of his. Myron was not part of this investigation, and drove to the predetermined spot, parked up against a wall, put it in park, and at a certain point that morning, then flash bangs went off, and the ATF was dispatched to come out of the U-Haul truck. They lined up, Agent Hanson was all the way to the right, and next to Agent Hanson, shoulder to shoulder were four other ATF agents, and there was St. Louis City Police all over, other ATF agents over. It should be noted that Agent Hanson- Just to be clear, Pollard was not one of those who had committed to the robbery? No, he had nothing, he was not mentioned. In fact, the testimony from every single agent was, they didn't even know who he was until after he was shot and killed, and they identified who he was. He was not part of this investigation at all. They jumped out, they were shoulder to shoulder, the only one to fire a lethal weapon that day was Agent Hanson. So they're all similarly situated, they all saw a vehicle, they all saw the situation. They knew there was a bucket truck coming in from an adjacent parking lot to disable the vehicle if it tried to escape. At some point, the vehicle, after it heard the flash bangs that went off by the ATF, put the brake lights on while the ATF is standing there watching this, put them in reverse. So they saw the reverse lights, and then it went about two and a half car lengths back, only about 44 feet, until the bucket truck disabled it. The bucket truck, as the video show, and I hope the court has seen these videos, that it shows the bucket truck coming in even before the car begins to reverse. And this was part of the pre-operational meeting that they had with all of the ATF agents, knowing there was going to be a bucket truck to disable this. It should be noted also that Agent Hanson's only threat that he perceived, and this is his testimony, was the vehicle. It had nothing to do with weapons, it had nothing to do with anyone else on foot. It was just the vehicle that he thought was a danger to him. He also testified that when he shot three times into the car, he shot in the side of the car, not in back, a car coming at him, but it was on a curve. And he shot three times, twice hitting the backseat passenger, and once, unfortunately, striking Myron Pollard in the head and fatally wounding him. As far as the video cameras, and then we'll get to the actual argument. The video cameras, there were four that were set up, as I mentioned. There were two under the tractor trailer. One of them had the best position, the best audio, the best video, and it didn't film anything. It had about a minute or so before the car even pulled up into the lot, and the testimony was, it must have malfunctioned. The second one was the one that froze at the moment that the first shots rang out. And again, there was a discrepancy between the two sides, whose shots they were. Were they Hansen shots when the car was backing up, the two and a half car lengths? Or was it the baton shots that were shot by Agent Hall, which are non-lethal, just to break out the windows? But the frame froze during that period. The audio keeps going, but you don't see anything. It skips from here to here, and shows a car jumping from one position to another. The video then stops as soon as the bucket truck hits it, and then you hear bang, bang, bang, and then it just stops immediately. I'm going to address that in a second. The pole camera was just video, and if you look at that, it shows the car parked up against the wall. And then there are four seconds, about four and a half seconds missing, and then you see the next frame is a bucket truck hit it 44 feet away. There's nothing in between showing the path of the car, or when the agents jump out of the vehicle. That part is missing as well. And finally, the surveillance video shows the bucket truck come in. And unfortunately, because of where it was positioned, the bucket truck obscures the view of the shots being rung out. But it shows, you could hear the impact with the bucket truck from behind, and then that's it. It cuts out those bang, bang, bang shots afterwards. And the import of this is the following. Agent Meyer was the head of this operation. Agent Meyer was with the technical assistant French, who's the one who's in charge of shutting off these videos and burning them to a DVD. Agent Meyer's testimony was that he was with Agent French in the surveillance vehicle. He said, I heard flash bangs. I heard the screech of the car. I heard gunshots. I heard the bang of the impact of the vehicle along with the bucket truck. He said, I went out to assess the scene, then I told Agent French to shut off the video. But that's not what the videos show. The videos show as soon as the bucket truck hits it, they're cut off. So we asked for the original recordings that were, before they're burned to a DVD, for the original recordings. And the government said, they're gone, we erased them. And they said, because we normally just do a routine erase, and we didn't know that there was going to be any litigation. Well, first, they knew that there were four criminal defendants who were alive who were arrested at the scene, so they needed that. Second, they knew that where a death is involved, that Agent Hanson was probably going to be investigated by the Circuit Attorney's Office or the US Attorney's Office. And third, they knew where there's a death involved, there's most likely going to be either a Bivens claim, an FTCA claim, or both, which in this case, there were. So there was a reasonable expectation to preserve that original recording that was on the server. One of the servers from the poll camera was 20 miles away, where French was the one who could shut it off, the technical assistant. But you see him at the end of the video on the scene, and he said that he's the one who could shut it off 20 miles away. So if it takes him 20 miles to get there, and about 30 minutes or so, or 40 minutes to shut it off, where's the rest of the video if he's shown at the end of the video at the scene? So we went through this, we went through a lot of arguments with the court. At first, Judge Limbaugh here in the district court said there was, quote, a serious concern that the key four seconds of the video during the shooting itself were somehow lost. And he then sent, he ordered the government to look up those files, those original servers, and see actually if they could find those files before they were burned to DVDs. And incidentally, there were about 20 days that the DVDs couldn't be accounted for. They were put in a temporary locker from that day, and they weren't put in a permanent locker until 20 days later. And again, that's part of the evidence in this case and part of the trial. At some point later on, the judge then said that we are allowed to argue an inference to the jury. He wasn't going to instruct them, but just that we were going to be able to argue the inference as opposed to a presumption that the missing parts of the video would have been detrimental to defendants. And then on the eve of trial, there was a motion in limine that was filed by the defendants. And then the judge, and we argued this before the judge, and that same day, the judge reversed it and said that he's not going to allow us to argue an inference. And then at trial, when all of these things came out about when Meyers said when French should shut off the video, because those parts are missing, there should be at least 10, 15, 20 seconds at a minimum past when all these videos are. The judge said, and I'm going to quote the judge, quote, maybe he, meaning me, maybe he is right about it, about there's a problem here with when these things were shut off. And had the judge known, had Judge Limbaugh known about these, his decision probably would have been something different. I'm going to bring to the court's attention now, rule 37E was enacted, the new rule, in 2015. And the government does cite some cases that are pre-2015, pre-rule 37E. And really, it's a two-pronged test. The first one is the failure to preserve electronically stored information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court, and then there are two prongs. One, upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice. That's at a bare minimum where we were, when the judge said, I would be allowed on behalf of plaintiffs to at least argue an inference. Not give an instruction, but at least tell the jury, hey, these things are missing. You can then have an inference, an adverse inference, why these tapes are missing and why those crucial portion of not one, not two, not three, but all four videos are missing in this. But if there is an intent to deprive another party, in other words, if we could find some intention, then the court can go even further. And that is presume that the lost information was unfavorable or instruct the jury. It may or must presume it would be unfavorable or dismiss the action. We're not asking that the action be dismissed, obviously, but at least argue. Be allowed to argue before the jury about that, but the judge didn't allow us to do that. Was it prejudicial? Absolutely, those missing parts of those tapes are the crux of our case. It shows when the shots rang out, how many shots were fired, where they were fired. And to say that one malfunctioned, but we destroyed the server, the information on the server. The next one that shows frozen videos, the third one that just shows the bucket truck with no shots afterwards. And the final one, the poll camera, showing four and a half seconds missing from the time it was parked to the time the bucket truck hit it, is extremely prejudicial to our case. What are the key facts that would be missing? Would it be the location of the officers? For which one, for the- For, you say there's prejudice. Right. And so I'm trying to drill down on that a little bit. Okay. Is the prejudice the fact that you weren't able to place the officers, I assume you would want to say, outside the path of the vehicle? Right, so there are two aspects to it. One of them is, where were the officers in relation to the vehicle when the shot was fired and when the shot was fired? So when the vehicle was parked, and their testimony was that they lined up about 21 feet away, shoulder to shoulder. The poll cam shows nothing. It doesn't show where they were, how they were lined up from an overview of the scene. So that's missing. The second thing was because it was shut off when French was still there. So he went back to his office and then only burned the part up to the time a little bit after the crash. It doesn't show where the evidence markers were placed, where the search for the casings were. Because all we see is after the fact that, here's a casing, and we don't know who put what where and where the casings were. That part's gone. For the parts that were under the tractor trailer, it's the actual shooting. One of them totally malfunctioned. It had the best view and there is no video. They said it malfunctioned. The one that did function, there was the part that was missing of who made those shots. Because you see a car jump from here over here, but you hear bang, bang, bang. And then you see the bucket truck at the end, and then you hear at the end another bang, bang, bang after it was already disabled. And finally, the prejudice from the surveillance video was as soon as the bucket truck hits it, you don't hear anything because they shut it off at that point. Had you heard, and this is the essence of the prejudice, everyone agrees that if you have a disabled car with a bucket truck, you can't shoot in the car and try to kill somebody because it's already disabled. And that part is gone from the video. And according to Agent Meyer, he didn't instruct French to turn it off until way after that. He said, after it hit, I got out to assess the scene, then I told him, then he shut it off. And that's missing. So, Judge Grunder, if we would have had that, the sound of the bang, bang, bang, and the scene at least 10, 15 seconds later, we could have seen that Hansen shot at the vehicle after it was already disabled. But that's not, those things you just described, that's not a failure to preserve, that's an unexplained failure to record. No, the failure to preserve was, these were recorded onto a server, and they erased the server. They said, we burned copies. Well, first of all, we all know that with burning copies, there are glitches in burning copies. Sometimes things skip, sometimes they don't record. If they destroy the original server on all of these, then, and none of them show the actual shooting or what happened afterwards. As I mentioned in my brief, once it's a glitch, twice it could be a coincidence, three, it starts raising eyebrows, four times. I don't think there's a question what happened here, because they destroyed the original server. That's the spoliation part. We had no right, not right, we had a right. We had no opportunity to look at the original recording because they destroyed it. The explanation was an agent that was not connected with the investigation erased it or destroyed it. No, he was. It was involved. Was there testimony about the circumstances of the destruction of the videos from the people involved? Right, so Judge Shepard, during the deposition of Agent French, which was part of our motion to Judge Limbaugh in the district court, we have his entire testimony where he explains and he goes through that, and that's in the record. During the testimony at trial, when I asked Agent French about that, he actually went into that about when they did it, and I believe, and don't quote me, but I believe the government then asked further questions about, you routinely go through these after a period of time, and then make room for other things, etc. So it was someone who was part of this investigation. He was the one who set up the cameras. He was the one who burned the DVDs. He was the one who turned off the cameras. And he was the one who actually recorded over these things. The reason I ask the question that way, the government's brief says that during routine maintenance, an ATF agent who was not involved in the undercover arrest deleted the contents of the server. Okay, I'm going to review that. I'm going to reserve my time at this point, and I would like to come back if I may at rebuttal and answer that question. So I could have time to review that, if that's okay. At this point, I'm going to reserve the remaining time and request that the court reverse the judgments of the district court and order a new trial in this matter. Thank you. May it please the court. I'm Assistant United States Attorney Karen Schutte, and I'm here on behalf of the appellees, the United States of America, and Special Agent Bernard Hanson. Your honors, we are not here today to decide the facts. That was what the trial court did. That is what the jury did. We're here to review the decisions that were made by the district court during the course of the trial. So it's really important to keep in mind the standard of review. The vast majority of the claims of error that have been alleged by Ms. White are to be reviewed under the abuse of discretion or clearly erroneous standard. These are high burdens to meet. The district court had wide latitude in reviewing the evidence and in light of the circumstances making those rulings. There are two claims here. There's a Bivens claim that was asserted against Agent Hanson and an FTCA claim that was asserted against the United States. Those claims were tried together in a bifurcated trial, and it's important to remember that there's certain evidence that goes to the Bivens claim. There's other evidence that goes to the FTCA claim, and that we need to remember the different standards to be applied for each of them. Now, I want to talk to the court about the FTCA claim first, because the district court entered judgment in favor of the United States on that claim. And if this court affirms, the FTCA's judgment bar applies by operation of law and prevents a Bivens judgment against Agent Hanson. So therefore, there's no need to dive into the weeds about these evidentiary issues that occurred in relation to the Bivens claim. So on the FTCA claim- Would that be true of the spoliation argument? Excuse me, your honor? Would that, you're saying we wouldn't have to consider that. Right. But that wouldn't necessarily be true with respect to the spoliation argument, which was most of Mr. Shalowitz, which was all of Mr. Shalowitz's argument today. Right, and what he did say in his argument was that he wanted to be able to argue to the jury that there was destruction of evidence, and that he wanted a jury instruction regarding the adverse inference. So that would only apply to the Bivens claim, which was against Agent Hanson. So there would be no need then under his claim to address it on the FTCA claim that's decided by the district court. So you don't think the spoliation argument goes to the judge-tried portion as well? It could, but my understanding based on what Mr. Shalowitz said was that he wants it to go to the Bivens claim. That might have just been loose language, so to speak. Sure, so yes, and I will then address the spoliation issue because it could potentially go to the United States. It would be in a different manner, obviously, because it would not be a jury instruction, would not go to the judge. On the spoliation claim, there has to be intent and prejudice in order to enter sanctions. And again, this is reviewed for abuse of discretion. With regard to intent, there was no evidence that anyone, whether it was Agent Hanson or anyone from the United States, intended to suppress the truth here. As Judge Shepard pointed out, in our brief we cited, and it is supported by facts in the record, and the only facts in the record, that the server was deleted as part of routine maintenance by someone who was not involved in this investigation. The reason why the server was deleted, that it was a piece of equipment that was no longer being used by ATF, and they were getting rid of it. So the person that deleted it first checked with all the case agents to make sure that they had copies of the contents, and confirmed that they did and deleted it. Now, ATF's standard procedure for handling videos is to record them onto a server, and then download the contents onto disks, and those disks go to the case agent, they get an evidence tag, they go into the chain of custody. And that's how they handle the evidence for criminal cases. The duty to preserve in this case began when the SF-95, or the notice of the administrative claim, was filed. The server was deleted a year before that. Now, I ask the question of counsel, with respect to what happened in this case, the alleged deletion of the contents as a part of routine maintenance, what's the, how was that information presented? Were, did the individuals involved, did the agents involved in the routine maintenance testify, or was this some, did a custodian testify? How was it presented? It was presented in a couple different ways. The person that actually deleted the server provided a declaration that was submitted to the district court prior to trial in connection with the motion for sanctions. And then the employee of ATF who actually set up the cameras and was in charge of doing the downloading, he testified by deposition, and then he testified live at trial. And at trial, he specifically stated, and it's in the trial transcript, volume two on pages 128 and 130, that he downloaded the files directly from the server onto DVDs without cutting, editing, or deleting any footage. That's the only evidence from anyone about what happened. Everything else is speculation about whether there was a glitch. There was no testimony from anyone that there was, in fact, a glitch between the downloading and the saving. Yes, there were glitches with the functioning of the cameras and the placement of the cameras. But that is a wholly separate issue than a spoliation issue. And over the government's objections, Ms. White was allowed to argue very vigorously and elicit quite a bit of testimony about the setup of the cameras, the malfunctions, and whatnot. So while she was not allowed to actually argue an adverse inference, she was given great latitude to at least raise the issue to the jury. And I think it eventually became an issue of weight of the evidence for them. But ultimately, the jury decided in favor of Agent Hansen on the- And again, what was the specific reason given for the absence of the crucial footage? That there were issues with the transmission of the video. All of the cameras were remote, so they were recording and it was being transmitted either through the Internet or through cellular service. Excuse me? Were there other omissions? There were, yes, there were. There were, on the different videos, there were a couple different places where there were interruptions in the streaming of the video. And that was based in part due to slow Internet service, and then with the movement of the cars, there was a bucket truck that came in and disrupted one of the signals. And the ATF employee who set up the cameras testified about that and explained the reasoning for this. Well, that might be a plausible explanation, but not the only one. That's the only evidence that was elicited, though. Well, doesn't that strike you as being more than passing strange that the crucial footage was not there? It doesn't, Your Honor, because of- Well, you're representing your defendant, of course, you have to say that. But a reasonable juror might bear results that this cries out for a better explanation. The jury could have considered that, because- Under the instructions that were given? It was not an instruction, but it was argued. There was evidence that was elicited. This agent- Would an instruction have made it more powerful? It would have, but it would not have been proper under the law, Your Honor, because there has to be intent and prejudice. And the intent factor is not here. There's no proof of intent unless somebody says, I did wrong, I did wrong, I did wrong. No, but the- The jury decided whether there was intent. That's an issue of law for the judge to at least make sure that there's a threshold there that Ms. White did not meet. An issue of law in which we can say he was just flat wrong. Excuse me? It's an issue of law that we can say he just got it wrong. Yes, but the evidence that was put forth to Judge Limbaugh prior to trial and throughout trial does not raise the level of any sort of inference. Or, excuse me, any sort of intent. Because of the timing. If you look at the timing, for one, that the server was deleted in advance- Well, the look of the facts in the light most favorable to the ruling, I suppose. But I don't know if that's the correct standard of review. Your Honor, it's an abuse of discretion standard. And the judge at the trial level looks at the evidence to at least determine if there is some intent of a desire to suppress the truth. And in this case, the district court judge found that there was no evidence of intent to suppress the truth. So that is entitled to deference. And when you look beyond what he said and actually at the facts in the record, there are no facts that would suggest that the server was deleted with the intent to suppress the truth. It was part of routine maintenance. It was a year prior- There was no evidence of mendacity on the part of the officials? Right. There was no evidence of any sort of ill will or bad faith. And it's important to remember that we have DVDs that have the video footage on them. This is not a situation where there's nothing left. We have the DVDs that the agent said he downloaded directly from the server. They are an exact duplicate. And there was no evidence offered by any witness that said that there is a possibility of a degradation of the quality or some sort of mishap. That has been an argument that Ms. White's counsel has maintained throughout the case, but it's not based on any evidence. Sort of reminds me, of course, you're way too young to have ever remembered it. What was it, 17 and a half minutes in the Nixon tapes? With all these convoluted explanations of Rosemary Wood couldn't reach from one side. Well, I don't want to- Well, anyway. My memory goes back farther than yours. Your Honors, we also have testimony from witnesses that establish what happened on this day in question. So there is other evidence available. There were multiple witnesses that testified throughout the case about what they saw, what happened. The government had an expert witness testify who is an accident reconstructionist. Any non-law enforcement witnesses? Yes, there were. There were two. There were expert witnesses, but non-experts. There were two non-law enforcement witnesses. One was Demetrius Creighton, who the plaintiff called the driver of the car, who is a convicted felon and admitted to lying under oath. The district court found him not to be credible. But importantly, there was an independent witness, an eyewitness, who was near the scene, who's not associated with anyone in this case. Ms. White called that witness in her case in chief. And that witness, his events were perfectly aligned with what Agent Hansen said happened. And that witness said that there were no shots fired after the crash. And the district court found that that witness was credible. Do any of the videos that remained reflect the position of the officers at the time of the shooting? There are some. It is difficult because there are different angles. And so there are certain videos where even Ms. White's own expert witness said the angle was deceptive. But the poll camera was the video that was up high looking down into the parking lot. And that one gives a better angle. And there were some still photos that the attorneys used, still frames from that video, that do show some of the positioning. And it is hard to tell exactly what time all of that happened. All of this happened in about four seconds. But using those photos, Agent Hansen was able to describe where he was standing when he fired the shots. And the district court heard that. The jury heard that. And both of them found in favor of Agent Hansen and the government on the claims. I have one final question if you can clear up one matter on the deletion or the erasing of the server. And you said that the person responsible for that prepared a declaration. Yes. Was there ever an opportunity, or maybe stated differently, was there anything to prevent that person from being called at some point in the proceeding as an in-person witness to be subject to cross-examination about the testimony and about the circumstances of what occurred? No, Your Honor. Ms. White could have called this person as a witness to testify at trial. The person is still employed by ATF and could have come in to testify. But the focus of Ms. White's arguments at trial were on the quality of the footage, the placement of the camera, the downloading. And that was not done by the person that deleted the server. That was done by Jason French. And he did testify live at trial and, in fact, was on the witness stand, I think, longer than anyone else in the entire five-day trial. On the issue of the FTCA claim, the district court correctly entered judgment in favor of the United States by finding that there was no duty that was owed to Myron Pollard by Agent Hansen. Under this claim, we look to Missouri law. And duty is usually established by a statute or by some kind of special relationship between the person accused of the negligent act and the person injured. Here, Missouri has never held that a private citizen owes a duty to safeguard another citizen absent some kind of special relationship. And here, the normal situations where a special relationship is found is with doctors and patients, with jailers and detainees, landowners and invitees. Mr. Pollard was not in federal custody. He hadn't been arrested. This didn't happen on federal property. There was no duty that Agent Hansen owed to Myron Pollard to keep him safe in this situation. The district court further held that even if there was a duty owed, that there was no breach of a duty. And that is a decision that is reviewed under the clear error standard. The district court made many factual findings in its memorandum in order regarding the FTCA claim. And the vast majority of those are credibility determinations. Those are entitled to even greater deference. One of the determinations that the district court made was that the credible evidence supports the conclusion that the car appeared to be reversing directly at the agents when it first started reversing and that it was traveling quite fast in a confined space. The district court also adopted the version of events that Agent Hansen testified to on the stand. The district court found that the government's expert witness was credible. The only witness that the district court found to be not credible was Demetrius Creighton. And that is the only witness that actually supports the version of events that Ms. White argued in the case. In addition, Mr. Shalowitz made a comment about there being a photo of the agents being lined up shoulder to shoulder. His own expert witness at trial said that that camera angle was skewed and that it was not accurate. The district court had the unique opportunity to observe the witnesses at trial to pick up maybe on visual or tonal cues in their testimony, things that may not be reflected in the transcript. So therefore, those findings of credibility are entitled to great deference. And that's why we don't need to dive into those facts here and fight about who said what because it's in the transcript and the district court found every witness to be credible except for Demetrius Creighton. Let me ask you, the Missouri Public Duty Doctrine, does that apply just to public employees? Under Missouri law, yes. So how does that work vis-a-vis the Tort Claim Act that says you're liable to the extent of private person? It is unclear, Your Honor. This circuit has not specifically ruled that the public duty doctrine is inapplicable. In FTCA claims, other circuits have ruled that. And because of that, I'm not asking the court to apply the public duty doctrine here. The same analysis can be used just looking at whether a private individual would owe a duty in this situation. And it is difficult in these situations where we have a law enforcement officer and it's something that is unique to government, that there are not going to be many or any Missouri cases where they are looking at a negligence claim of a person that shot another person while the car is reversing. Given the sort of convoluted interplay here, what standard do you think we're supposed to apply? What standard of care applies and why? It's the traditional standard of care that is used in Missouri in negligence cases. As treating the officer as a private person? Yes. And so what standard would that be? We're looking at foreseeable risk and that if there is some kind of foreseeable risk, then the person who is accused of the negligent act needs to try to avoid that. They don't want to injure the person if there is some kind of foreseeable risk that that injury could occur. So shooting in a car is a foreseeable risk. You're going to hit a passenger, right? It's not in this situation, Your Honor, because the foreseeable risk depends on the relationship between the parties. Where there is a very clear special relationship between a doctor and a patient, for example, the risks of injury or some sort of damage are very foreseeable because of that relationship. But in this situation where there is no relationship between Agent Hansen and the passenger in the car, there is no foreseeable risk. Could I ask one more question? Again, in 20 words or less, what is your analysis of the preclusive effect of the FTC ruling on the Bivens claim? That the judgment bar in the FTCA bars a Bivens claim if this court affirms the district court's judgment on the FTCA claim. And that is contained within the FTCA statute and happens by operation of law. And the law is clear on the point you just made? It is not clear in this circuit yet, but many other circuits. In other words, it means that it's an open question in the 8th Circuit? It is in this circuit. The 4th, 5th, 6th, 7th, 10th, and 11th circuits have all held that the judgment bar would apply in this situation. And the 7th Circuit's opinion in Manning is particularly instructive. Your Honor, I see I'm about to run out of time. May I finish? No, thank you. Certainly, you can finish. Okay. Your Honor, so if you look to the Manning case, it's instructive on the application of the judgment bar. It's an unambiguous statute. There's no need to look beyond the plain language. It says it's a complete bar to any action by the claimant that's by reason of the same subject matter, which is what we have here. Your Honors, I thank you for your time and ask you to affirm the judgments below. Thank you, Ms. Schutte. If I may please the Court, Judge Shepard, to answer your question, I looked through the brief, and on page 11, there are various times during the trial, on the second day of trial, where Agent French was the one who said that he did not compare the DVDs with the original recording on the server and destroyed the original recordings on the server that was in the van. That's on the second day of trial, page 53, lines 17 through 23, page 54, lines 5 through 21, page 55, again page 222, page 128. This was all several times during his testimony that he was the one who actually destroyed that, and he was the one who set up the cameras. He works for ATF. With regard to what Ms. Schutte just said, there were three people who reviewed all of the videos upon Judge Limbaugh's order. There were Christine Beardsley, an agent of ATF, Michael Beltz, an agent of ATF, Stephen Brodsky, who is the litigation section. He's an attorney in the Office of Chief Counsel of ATF. It was all ATF reviewing them and looking at these. As far as we weren't allowed to argue it at all, so to delve into this, to answer your question, could we have delved into why and when and where this was all? If we weren't allowed to argue it before a jury, what would be the purpose of delving in? Who was the person that submitted the declaration that counsel referred to? I don't know. The declarations I read, which are in the record, pages 255 to 261 of those three individuals, they said they reviewed the erased tapes. The testimony trial was it was Agent French, who was the one who set up the cameras and who burned the DVDs, gave it to someone else. They were not in the permanent locker for 20 days. I mean, this whole case with this is just laden with just bad stuff, to put it in just the vernacular. I did want to touch on some things that we didn't touch on, and I understand it's rebuttal, about the jury instructions about Vardier with the not being allowed to ask the insurance question. That's already been briefed, and we would ask the court to look at that. But I did want you to take a look at Exhibits 37 through 39, and it shows the pictures of the agents lined up while the car is just starting to reverse, and then 38, where you see the side view mirror, and they're aiming toward the side of the car with nothing discharged at that point. And then the side of the car where they're still lining up at that point. This is taken off of the video camera. And then finally, this is where the shot is fired. And we don't know, again, if it's Hanson shooting in the side of the car, which is what the government says, or if it's Hall with the baton around shooting out the window. But what is essential here is that there clearly was not a full recording that was made. The server was destroyed, so we can't look at it. The DVD was not downloaded of the entire incident. According to Meyer, Agent Meyer, who was the chief guy on this entire operation, we would ask that the court reverse the district court and remand for a new trial with specific instructions to allow a jury instruction on insurance, but more significantly to allow at least having me argue an inference of spoliation of evidence, an adverse inference, or a direct order from the court, from Judge Limbaugh, to then instruct the jury that they could presume an adverse inference. I thank you very much for your time. Very well. Counsel, we appreciate your appearance and arguments today. The case is submitted and we will decide it in due course. Thank you.